IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:10CR163 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| MIGUEL ANGEL CORREA, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on defendant's objection, Filing No. 33, to the findings and recommendation of the magistrate judge ("F&R"), Filing No. 29, on the defendant's motion to suppress, Filing No. 22. The magistrate judge recommends that this court deny the defendant's motion to suppress evidence and statements obtained by law enforcement officers after an encounter on a bus at the Greyhound bus station in Omaha, Nebraska, on April 28, 2010. See Filing No. 34, Hearing Transcript (Hr'g Tr.) at 66. The defendant is charged with possession with intent to distribute 500 grams or more of methamphetamine, its salts, isomers, or salts of its isomers, in violation of 21 U.S.C. § 841(b)(1).

Pursuant to 28 U.S.C. § 636(b)(1), the court has conducted a *de novo* review of those portions of the F&R to which the defendant objects. *United States v. Lothridge*, 324 F. 3d 599, 600-01 (8th Cir. 2003). The court has reviewed the record, including the transcript of the suppression hearing on June 30, 2010. Filing No. 34, Hr'g Tr. The court finds the magistrate judge's recitation of the facts accurately represents the testimony adduced at the hearing. *See id.* at 56-60.

I.  FACTS

Briefly, Nebraska State Patrol Investigator Jason Scott testified that he and Investigators Rasgorshek, Eberle, Lutter and Special Agent Paul Orduna were conducting commercial interdiction for drug trafficking at the Greyhound station in Omaha.  *Id.* at 5.  They were dressed in plainclothes, body armor and carried concealed weapons.  *Id.* at 15.  The officers targeted an eastbound bus and waited for its passengers to disembark.  *Id.* at 6.  Investigator Eberle then spoke to the bus driver and asked to see the tickets of the passengers who would be reboarding the bus to continue to its next destination.  *Id.* at 6-7.  Scott testified that, generally, the officers look for tickets that had been purchased with cash immediately prior to, or less than 24 hours before, departure that were for travel between known drug source and destination cities.  *Id.* at 6.  Investigator Eberle later relayed the names of three passengers to Investigator Scott.  *Id.* at 7.

The officers watched the passengers reboard the bus and then Investigators Scott, Eberle and Rasgorshek "boarded the bus and started in the rear of the bus contacting each and every passenger and just asking them if they could present a ticket in an effort to locate the three individuals that Investigator Eberle had located."  *Id.* at 8.  Investigators Scott and Eberle walked up the aisle from the rear of the bus and Investigator Rasgorshek was "kneel[ing] in the driver's seat" of the bus.  *Id.*  Investigator Lutter stayed off the bus, and Investigator Scott did not know where he was during the encounter.  *Id.* at 28.

The defendant was seated in the front third of the bus.  *Id.* at 8-9.  Investigator Scott testified that he identified himself to the defendant, showed his credentials and "explained that he was not under arrest or in any trouble, that we were just speaking with passengers on the bus, asked him if he could produce a bus ticket."  *Id.* at 9.  The defendant produced

2

a ticket and Investigator Scott recognized the name as one that Investigator Eberle had mentioned, noticed that it had been purchased with cash six hours before departure and that it was for travel between Las Vegas and Des Moines.  *Id.* at 9.  The defendant also gave his driver's license to the officer.  *Id.* at 41.  Investigator Scott asked the defendant "where he was headed to, how long he might be there, where he was coming from, where he called home, and what items on the bus belonged to him."  *Id.* at 10.  The defendant stated that he was going home to Des Moines, Iowa.  *Id.*  Investigator Scott testified that "[b]ecause he had told me that Des Moines was home and then he had told me he'd been in Vegas for ten years, I clarified as to where home was, and he changed that story and said he lived in Las Vegas and—and that he would be visiting Des Moines, Iowa, to see family and was unaware of how long he would be there, but it might be up to a couple of weeks."  *Id.* at 10-11.  Scott testified that the defendant did not appear confused, but that the defendant's responses were evasive and the defendant became increasingly nervous as time went on.  *Id.* at 11.  Scott also stated that the defendant periodically reached over and repositioned a jacket in an empty seat next to him.  *Id.*  The defendant identified a small gym bag in the overhead compartment as belonging to him.  *Id.* at 12.  Investigator Scott testified that he thought the small bag was not consistent with a trip of several weeks' duration.  *Id.*

   Scott testified that he returned the defendant's documents to him and then explained that he was "watching for people transporting illegal items such as guns, knives, drugs, large amounts of currency, things that aren't supposed to be on the bus" and asked for permission to search the defendant, his bag, and the jacket next to him.  *Id.* at 12-13.  He stated that the defendant responded "yes," and then stood up, at which time Scott

testified he told the defendant to remain seated and asked the defendant to hand him the jacket.  *Id.* at 13-14.  Scott testified once he asked for the jacket, the defendant was "somewhat apprehensive" and that he noticed that the defendant "seemed defeated at that point," and that

> [h]e kind of took a—a big deep breath, reached over, grabbed the jacket, would not make eye contact with me, stared at the floor of the bus, handed me the jacket and kind of slumped his head down as—almost as if he were defeated and then, you know, moments later I located the packages and asked him to stand up and he did.

*Id.* at 21.  Investigator Scott agreed that the behavior was "like [the defendant] had been trying to avoid having [Scott] look at this jacket and he had lost" and characterized it as a "look that we generally get when people know that they're caught."  *Id.* at 38.  The defendant handed the jacket to the officer and Scott noticed it was heavy.  *Id.* at 16-17.  Investigator Scott then searched the jacket and found "two gray duct taped wet wipe bundles" in the interior pockets of the jacket.  *Id.* at 17*.*

Officer Scott testified that he had found several similar packages in previous searches and that he had "never come across a duct taped wet wipe container that did not contain methamphetamine."  *Id.*  Investigator Scott testified that, at that point, he "placed Mr. Correa in custody, detained him in furtherance of our investigation until I could determine what exactly was in the bundles," handcuffed the defendant, removed him from the bus and escorted him to a back room where the packages were opened and methamphetamine was discovered. *Id.* at 17-19. Upon discovering the methamphetamine, the defendant was given a *Miranda* warning and formally arrested.  *Id.* at 19-20.  After he was Mirandized, Mr. Correa made several incriminating statements to the officers.  *Id.* at 20.

4

Investigator Scott testified that the conversation on the bus lasted only a matter of minutes. *Id.* at 41. He did not know the defendant's country of origin, level of education, or prior criminal history but testified that the defendant did not appear to be under the influence of drugs or alcohol and seemed to be of average intelligence. *Id.* at 16, 35-36.

The magistrate judge found Investigator Scott was credible. *Id.* at 56. He found the initial encounter between the defendant and Investigator Scott was a consensual encounter. *Id.* at 60. Viewing "the totality of the circumstances, including the characteristics of the accused," the magistrate judge noted that the defendant was able to communicate with Investigator Scott and answer the questions, and "there was no evidence that he was in any way not of at least average intelligence, and it was Scott's opinion that he was." *Id.* at 61. The magistrate judge next applied the factors set forth in *United States v. Chaidez*, 906 F.2d 377 (8th Cir. 1990), and found the defendant's consent to the search was voluntary. *Id.* He also found that after Investigator Scott found the duct-taped wrapped containers, the encounter became an investigative detention "which is a seizure of limited scope and duration within the Fourth Amendment and must be supported by reasonable and articulable suspicion of criminal activity." *Id.* at 63. The magistrate judge found that "Investigator Scott had such an articulable suspicion of criminal activity although he certainly did not have probable cause." *Id.* Further, the magistrate judge found that "the record in this case does not reflect that Scott put the individual under arrest when he cuffed him and moved him," agreeing with Investigator Scott's characterization of the episode as a continued detention. *Id.* at 62. The magistrate judge also stated that "the removal from the bus to the room in the Greyhound bus depot was either "part of the never withdrawn consent" or an investigative detention. *Id.*

The defendant objects to the magistrate judge's characterization of the initial encounter between Investigator Scott and Mr. Correa as "consensual." Filing No. 34, Brief at 5. Further, he objects to the magistrate judge's finding that the defendant was of average intelligence and argues that the magistrate judge improperly shifted the burden to the defendant on that issue. *Id.* at 8. He also objects to the magistrate judge's finding that the defendant consented to the search of his person and belongings and the finding that the consent was freely and voluntarily given. *Id.* at 8-9. The defendant also objects to the finding that handcuffing the defendant and removing him from the bus was merely a "continued detention," and contends that the defendant was subjected to a warrantless arrest at that time. *Id.* at 10. He further objects to the magistrate judge's conclusion that, after finding bulges in the defendant's jacket, Investigator Scott had "an articulable suspicion of criminal activity." *Id.* at 11-12. Last, the defendant contends that the statements the defendant made after his arrest should be suppressed as "fruit of the poisonous tree." *Id.* at 14-15.

   II.   DISCUSSION

      A.   Law

A consensual encounter is not a seizure; thus the Fourth Amendment is not implicated. *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010). A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification—so long as the officer does not convey a message that compliance with his request is required. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that general police questioning within the confines of a bus does not establish a seizure *per se*); *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (stating that

6

"[a] seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area"). If a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. *United States v. Drayton*, 536 U.S. 194, 206 (2002) (reaffirming that questioning on a bus is not a *per se* seizure and adding that there is no requirement in conducting a consensual search that police advise a suspect that he is free to go).

However, "[a] seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "When a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*, 551 U.S. at 249 (quoting *Bostick*, 501 U.S. at 435-36). The determination of whether a seizure occurs, "which rests on a reasonable person's belief about the surrounding circumstances, is a legal characterization," and thus a question of law for the court. *United States v. McKines*, 933 F.2d 1412 (8th Cir. 1991) (en banc).

"A sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." *Brendlin*, 551 U.S. at 257 (noting in connection with a lawful traffic stop that if "likely wrongdoing is not the driving, a passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so

7

obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place"). Rules allowing brief detentions for officer safety reflect "a societal expectation of 'unquestioned [police] command'" that is "at odds with any notion that a passenger [in a traffic stop] would feel free to leave, or to terminate the personal encounter any other way, without advance permission." *Id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (2007)). The fact that an encounter, which would have been constitutional had it occurred on the street, "takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure." *Drayton*, 536 U.S. at 204.

Under *Terry v. Ohio*, 392 U.S. 1, 6-7 (1968), an officer may briefly detain a citizen "if the officer has a reasonable suspicion that 'criminal activity may be afoot.'" *United States v. Ortiz-Monroy,* 332 F.3d 525, 528 (8th Cir. 2003) (quoting *Terry,* 392 U.S. at 30); *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004) ("To detain a person, law enforcement agents must have a reasonable suspicion that criminal activity is afoot"). The standard of articulable justification required by the Fourth Amendment for an investigative, *Terry*-type seizure is whether the police officers are aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. *United States v. Walker,* 555 F.3d 716, 719 (8th Cir. 2009).

Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. *Id.* The officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances that which "describe a very broad category of predominantly innocent travelers." *Reid v.*

8

*Georgia*, 448 U.S. 438, 440-41 (1980) (noting that origination in source city is a circumstance that "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as [that presented in the case] could justify a seizure"); *United States v. Tillman,* 81 F. 3d 773, 775 (1996) ("Conduct that is typical of a broad category of innocent people provides a weak basis for suspicion.").[1]

What begins as a consensual encounter can escalate into a *Terry*-type investigative detention requiring reasonable articulable suspicion to survive Fourth Amendment scrutiny. *United States v. White*, 890 F.2d 1413, 1416 (8th Cir. 1989). There is no litmus test for distinguishing a consensual encounter from a seizure—the test is "necessarily imprecise because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988); *United States v. Griffith,* 533 F.3d 979, 983 (8th Cir. 2008). Circumstances that inform the determination are: officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation

---

[1]The Eighth Circuit has consistently found certain interdiction "indicators" do not furnish probable cause or cause for a reasonable articulable suspicion because the indicators are as consistent with innocent activity as criminal conduct. *See, e.g., United States v. Jones*, 254 F.3d 692, 697 (8th Cir. 2001) (walking around the phone bank, looking behind him, traveling without luggage, and arriving from Los Angeles); *United States v. Collins*, 200 F.3d 1196, 1197 (8th Cir. 2000) (suspect arrived from source city, looked around, did not stop for luggage, paid for ticket with cash)*; United States v. Eustaquio,* 198 F.3d 1068, 1071 (8th Cir. 1999) (nervousness, no luggage, source city, same day purchase with cash); *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir.1999) (involving arrival from source city, hurrying, and new luggage); *United States v. Fletcher*, 91 F.3d 48, 51 (8th Cir. 1996) (source city, conduct in airport); *United States v. Green*, 52 F.3d 194, 200 (8th Cir. 1995) (source city, traveling alone, nervousness, new clothing and bag, walking hurriedly); *United States v. O'Neal*, 17 F.3d 239, 242 (8th Cir.1994) (source city, nervousness, walking briskly, athletic clothing, carrying athletic-type bags); *United States v. White,* 890 F.2d 1413, 1419 (8th Cir. 1989) (source city, time of day, cash ticket purchase and nervousness).

9

indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation. *Griffith*, 533 F.3d at 983. Statements that the purpose of a stop is to stop the flow of drugs or that a person detained fits a drug-courier profile would lead a reasonable person to believe that an encounter is more than routine questioning and that he or she is the focus of a narcotics investigation and is not free to leave. *United States v. Nunley*, 873 F.2d 182, 185 (8th Cir. 1989); *United States v. Sadosky*, 732 F.2d 1388, 1392 (8th Cir. 1984).

What begins as a consensual encounter or investigative detention can also ripen into a situation resembling a traditional arrest, triggering the requirement of probable cause. *Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("at some point in the investigative process, police procedures can qualitatively and quantitatively become so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments"); *Florida v. Royer*, 460 U.S. 491, 503 (1983) (holding that stopping a person at the airport, seizing his luggage, and taking him to a small room for questioning constituted an arrest). When the seizure of a person amounts to an arrest, it must be supported by an arrest warrant or by probable cause. *Kaupp v. Texas*, 538 U.S. 626, 630 (2003); *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed").

Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Probable cause exists when the facts known to the arresting officer would cause "a man of reasonable caution" to believe that an offense has

been or is being committed by the person to be arrested. *Dunaway v. New York,* 442 U.S. 200, 208 n.9 (1979); *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007). A "'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity' is sufficient." *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (quoting *Torres-Lona*, 491 F.3d at 756).

The probable-cause standard cannot be defined or quantified "because it deals with probabilities and depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371. However, "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt'" that "must be particularized with respect to the person to be searched or seized." *Id.* (quoting *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979))*; see also United States v. Chauncey,* 420 F.3d 864, 871 (8th Cir. 2005). The existence of probable cause must be "viewed from the standpoint of an objectively reasonable police officer." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Searches conducted without a warrant are presumptively unreasonable, subject to a few specifically established exceptions." See *United States v. Escobar*, 389 F.3d 781 (8th Cir. 2004). Consent to search is one such exception, and a warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search. *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *Escobar*, 389 F.3d at 784-85. No presumption of invalidity attaches to a warrantless search when consent is obtained without an officer explicitly informing a

11

citizen of the right to refuse consent, but "'knowledge of the right to refuse consent is one factor to be taken into account.'" *Drayton,* 536 U.S. at 206 (quoting *Scheckloth*, 412 U.S. at 227).

The government has the burden of proving by a preponderance of the evidence that a subject's alleged consent to a search is legally sufficient to warrant admitting the fruits of the search into evidence. See *United States v. Matlock,* 415 U.S. 164, 177 (1974); *Cedano-Medina,* 366 F.3d at 684. This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Royer,* 460 U.S. at 497. "'Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making.'" *Escobar,* 389 F.3d at 785 (quoting *Cedano-Medina*, 366 F.3d at 684 (internal citations and quotations omitted)). Factors to consider when determining if consent was freely and voluntarily given include the suspect's: 1) age; 2) general intelligence and education; 3) whether he was under the influence of drugs or alcohol; 4) whether he was informed of the *Miranda* rights; and 5) whether he had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals. *Id.; see United States v. Chaidez,* 906 F.2d at 380 (setting forth the totality-of-the-circumstances standard and factors to consider in determining the voluntariness of consent). The environment in which the alleged consent is secured is also relevant and the court considers: 1) the length of time the individual was detained; 2) whether the police threatened, physically intimidated, or punished him; 3) whether the police made promises or misrepresentations; 4) whether the suspect was in custody or under arrest when the consent was given; 5)

whether the consent occurred in a public or a secluded place; and 6) whether the suspect stood by silently as the search occurred. *Escobar,* 389 F.3d at 785. The factors should not be applied mechanically, and no single factor is dispositive or controlling. *Id*. Generally, an illegal detention will irremediably taint a consensual search that immediately follows the illegal detention. *See Royer,* 460 U.S. at 507-08 (where defendant was illegally detained when he consented to search of luggage "the consent was tainted by the illegality and was ineffective to justify the search."

Statements and other evidence obtained after an illegal arrest or search should be excluded as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 484-88 (1963). A voluntary consent to search that is preceded by an illegal police action does not automatically purge the taint of an illegal detention. *United States v. Esquivel,* 507 F.3d 1154, 1160 (8th Cir. 2007). Where illegal police conduct precedes consent, the government has the burden of proving that the consent "was given in circumstances that render it an independent, lawful cause of the officer's discovery" in order to purge the taint of the illegal conduct. *United States v. Herrera-Gonzalez,* 474 F.3d 1105, 1111 (8th Cir. 2007); *United States v. Kreisel,* 210 F.3d 868, 869 (8th Cir. 2000) (noting that in order to purge the taint of an illegal stop, the consent must be "sufficiently an act of free will"). To determine whether an intervening consent to search "is sufficiently an act of free will to purge the primary taint" of a Fourth Amendment violation, the court considers: (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation. *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975). Of these, "the purpose and flagrancy of the official misconduct is 'the most

important factor because it is directly tied to the purpose of the exclusionary rule-deterring police misconduct.'" *Herrera-Gonzalez*, 474 F.3d at 1111 (quoting *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006)). "Purposeful and flagrant" police misconduct has been found "where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Simpson*, 439 F.3d at 496.

    B. Analysis

The court disagrees with the magistrate judge's application of law to the facts of this case. First, the court finds that the magistrate judge erred in concluding that the initial encounter between Investigator Scott and the defendant was a consensual encounter that did not trigger Fourth Amendment protections. The court finds, under the circumstances presented in this case, that any reasonable person would have understood the law enforcement officers to be exercising control to the point that no passengers in the bus were free to depart without police permission, or to end the conversation and refuse to answer the officers' questions.

The facts presented here differ in several important respects from those presented in *United States v. Drayton*, 536 U.S. at 197-201.[2] Unlike the situation presented in *Drayton*, the evidence presented at the suppression hearing did not show that the aisle of

---

[2] Moreover, the precedential value of *Drayton* has been eroded to some extent by subsequent Supreme Court decisions indicating the Court's reluctance to provide incentives "to run the kind of 'roving patrols' that would still violate the driver's Fourth Amendment right." *Brendlin*, 551 U.S. at 263; *see also Arizona v. Gant*, 129 S. Ct. 1710, 1718-20 (2009) (noting the underestimation of the privacy interests at stake and the increasing tendency of courts and law enforcement to regard abilities to search without a warrant as police entitlements).

the bus was completely unobstructed so the passengers could exit.  There is no evidence that any passengers left the bus during the episode or that they would have been allowed to do so, nor was there any testimony that it was common for passengers to leave the bus for a cigarette or a snack while the officers were on board.  Investigator Scott admits that he told the defendant to sit down.  Although the officer did not characterize the statement as a command, it would have been reasonable for the defendant to assume it was.  The officer asked the defendant numerous pointed questions and informed the defendant that he was conducting drug interdiction and looking for contraband items that should not be on the bus.  A reasonable person would assume that such pointed inquiries presuppose a suspicion of criminal conduct and mean that the person is the subject of a particularized investigation into criminal acts and is not free to leave.  Most importantly, unlike the defendants in *Drayton*, the evidence shows that the defendant had already been singled out for investigation in advance of the purportedly consensual contact because he had purchased his ticket with cash and was traveling from Las Vegas.[3]

These facts, together with the fact that the defendant was not told he was free to leave or could terminate the encounter, indicate that the encounter was not as free of coercion as the questioning of bus passengers in Drayton.  The court cannot conclude from this evidence that the contact was a voluntary, cooperative conversation.  It is clear

---

[3]This is not to say that the officers' motives play a part in this analysis.  Of course, subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis and the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted. *Brendlin*, 551 U.S. at 260.  Officer Scott's focus on this defendant is discussed only as it is relevant to the objective test of what a reasonable passenger would understand under *Mendenhall*, 446 U.S. at 554 n.6.  *See Brendlin*, 551 U.S. at 260.

to the court that this case involves an investigative detention for which the government must show adequate justification.

The court finds that the encounter most resembles a *Terry*-type investigative detention and the government's contention that it was consensual does not make it so. The facts on which the officers relied to single out the defendant for questioning do not furnish the reasonable, articulable grounds for suspicion of criminal activity required to justify the detention of the defendant. The officers' targeting of the defendant was based only on the facts that he purchased his ticket with cash shortly before departure and was traveling from Las Vegas to Des Moines. This rationale is troubling. The officer's reliance on the defendant's purchase of a one-way ticket for cash shortly before departure is no cause for suspicion. Absent some evidence that it is unusual for bus travelers to do so, the court can draw no inference from the defendant's cash purchase. Bus tickets are generally less expensive than airplane tickets, and common sense dictates that bus transportation is more likely to be used by people who do not have credit cards. There is no evidence that the ground transportation industry provides any incentive to purchase a ticket early, as the airline industry does. Officer Scott's reliance on the trip's origination in Las Vegas is similarly meaningless. Because of the widespread availability of drugs and the prevalence of cross-country drug-trafficking, virtually every major metropolitan area in the United States can be identified as either a source or destination city, or both, for the illicit drug trade.[4]

---

[4] In this court's experience, Los Angeles, Denver, Phoenix, Portland, New York, Chicago, Philadelphia, and others have been relied on as "known" drug source or destination cities to justify searches, often by the same officers involved in this case.

Further, the court attaches no significance to the defendant's explanation of the purpose of his trip. It is neither suspect nor inconsistent to describe the place where a person grew up or where his family lives as "home." Also, the fact that the defendant carried only a small piece of luggage and acted nervous does not give rise to suspicion. Traveling light is conduct that is typical of many innocent travelers, as is nervousness in the face of interrogation in a confined space by presumably armed law enforcement officers. Given the method of law enforcement's encounter in this matter, the court has little doubt that these officers fully expected to obtain acquiescence to search from any passenger they chose.

The court next finds that the government has not sustained its burden of showing that the defendant's consent to search was voluntary. There is nothing in the record to support the conclusion that the defendant was of average intelligence and could reasonably comprehend the situation. Scott testified that he did not know the defendant's nationality, level of education or criminal history. The conversation lasted only a few minutes and included short responses, pointing and gesturing. The contention that the consent was a product of free and unconstrained choice is further undermined by the evidence of the defendant's "defeated" demeanor when asked for permission to search the jacket. The defendant's demeanor could be easily interpreted as reluctance to consent and at most shows a mere acquiescence to a claim of lawful authority.

Even if the consent were voluntary, it is tainted by the illegal detention that preceded it. The defendant's consent to search was obtained through exploitation of the police misconduct in effecting the original detention, which was investigatory in design.

The court further finds that the handcuffing of the defendant amounted to a seizure of his person that triggered Fourth Amendment protections. Even if the defendant had validly consented to the search of his person and luggage, he did not consent to his seizure. In light of these findings, the court need not decide whether the discovery of the duct taped bundles amounted to probable cause for arrest because the "fruit of the poisonous tree" doctrine mandates exclusion in any event. Accordingly,

IT IS ORDERED:

1. The defendants' objection (Filing No. 33) to the findings and recommendation of the magistrate judge (Filing No. 29) is sustained.

2. The defendant's motion to suppress (Filing No. 22) is granted.

DATED this 27th day of October, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.